UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CYNTHIA PIPER, ET AL., | No. C-07-00032 (JCS) |
| Plaintiffs, | Related Case No. C-06-05778 JCS |
| v. | **ORDER DENYING MOTION FOR AN ORDER DECLARING "OPT-INS" INVALID [Docket No. 36]** |
| RGIS INVENTORY SPECIALISTS, INC., | |
| Defendant. | |

## I. INTRODUCTION

On January 4, 2007, Plaintiffs filed a collective action under § 16(b) of the Fair Labor Standards Act ("FLSA"). 29 U.S.C. § 216(b). In recent months, they have filed numerous "opt-in" consents by individuals who seek to join the class. Defendant, RGIS Inventory Specialists, Inc. ("RGIS"), has filed a Motion for an Order Declaring "Opt-Ins" Invalid (the "Motion") in which it objects that the opt-in consents are premature because the Court has not yet conditionally certified a class in the action or authorized notice to potential class members. RGIS asserts that the opt-in consents should, therefore, be declared invalid. A hearing on the Motion was held on Friday, May 25, 2007, at 9:30 a.m. For the reasons stated below, the Court DENIES the Motion.

## II. BACKGROUND

### A. Procedural Background

#### 1. The Complaint

RGIS provides on-site inventory services to retail stores. Complaint at 5. It is a Michigan co-partnership that has over 40,000 employees and does business throughout the United States, including in California, New York, Pennsylvania, Florida, Illinois, North Carolina, Mississippi, and

Georgia. *Id*. at 4-5. Plaintiffs are current and former employees of RGIS who have been employed within the last three years as "inventory 'auditors,' 'product specialists,' 'merchandising specialists,' 'assistant team leaders,' and/or 'team leaders,'" collectively referred to as "Auditor Employees," who are not exempt from the overtime and minimum wage requirements of the FLSA "or applicable state law." *Id*. at 2, 5. Plaintiffs allege that "Defendant RGIS has willfully engaged and continues to engage in a policy and practice of not compensating them for all hours worked or spent in the control of RGIS, including time spent waiting and preparing for inventories to begin at job sites, and time spent donning and doffing equipment that RGIS requires Plaintiffs and the Class to wear and that is essential to performance of their duties." *Id*. Plaintiffs asserts claims for failure to pay minimum wage and failure to pay overtime compensation under the FLSA. *Id*. at 13-14. In addition, a subclass of California plaintiffs asserts various claims under California labor law. *Id*. at 14-20.

### 2. Other FLSA Actions Against RGIS[1]

#### a. *Johnson v. RGIS Inventory Specialists* (E.D. Tex.)

On June 7, 2005, a collective action asserting wage and hour claims under the FLSA was filed in the Federal District Court for the Eastern District of Texas. *See* Docket, *Johnson v. RGIS*, Case No. C-05-0389 ("*Johnson* Docket"). The plaintiffs in that case are represented by the firms of Schneider & Wallace and Grady, Schneider & Newman, LLP ("the Schneider firms"), who also represent Plaintiffs in this action. *See Johnson* Docket. The *Johnson* plaintiffs sought to bring a collective action in that case on behalf of "all non-exempt hourly employees of RGIS who were, or will be employed during the period of three years prior to the commencement of this action through the date of judgment of this action, who have not been fully compensated for all work performed, time spent, and acticities conducted for the benefit of RGIS." Declaration of Cheryl A. Sabnis in

---

[1] The Court takes judicial notice of the pleadings in the actions discussed below pursuant to Fed. R. Evid. 201. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (holding that "under Fed. R. Evid. 201, the court may take judicial notice of matters of public record); *see also Walker v. Woodford*, 454 F. Supp. 2d 1007, 1022 (S.D. Cal. 2006) (holding that "[d]ocuments that are part of the public record may be judicially noticed to show . . . that a judicial proceeding occurred, or that a document was filed in another court case").

2

Support of Defendant RGIS's Motion for An Order Declaring "Opt-Ins" Invalid ("Sabnis Decl."), Ex. B (*Johnson* First Amended Complaint) at 6.

In an order filed June 28, 2006, the court conditionally certified a much narrower class, namely, "all non-exempt, hourly auditors working within District 166, who were employed during the three-year period prior to the commencement of this action." *Id*., Ex. D (Order filed June 28, 2006).[2] The court then approved notice to be sent to potential plaintiffs in District 166. *Johnson* Docket No. 55. In the ensuing months, opt-in consents were filed by a number of plaintiffs seeking to join the collective action. However, on March 26, 2007, on summary judgment, the court decertified the class on the basis that the opt-in plaintiffs were not sufficiently similar. Declaration of Cheryl A. Sabnis in Support of Defendant RGIS' Motion for An Order Declaring "Opt-Ins" Invalid" ("Sabnis Reply Decl."), Ex. B (decertification order, dated March 26, 2007). In the order, the court dismissed the opt-in plaintiffs without prejudice and invoked its equitable powers to toll the statute of limitations for 30 days following entry of the order to allow the opt-in plaintiffs to file individual actions. *Id*. at 13. The named plaintiff was permitted to proceed individually. *Id*.

### b. *Davidson v. RGIS Inventory Specialists* (E.D. Tex.)

On November 2, 2006, another FLSA wage and hour collective action case was filed against RGIS in the Eastern District of Texas. *See* Docket, *Davidson v. RGIS*, Case No. C-06-00681 (*Davidson* Docket). The plaintiffs in that action are also represented by the Schneider firms. *Id*. In *Davidson*, the plaintiffs seek certification of a class made up of non-exempt auditors and/or team leaders in RGIS District 187 who have been employed by RGIS in the last three years. Amended Complaint, *Davidson* Docket No. 8. The plaintiff's motion for conditional certification is scheduled to be filed by June 4, 2007. *Davidson* Docket No. 21.

---

[2] Although the court does not explain in its Order what "District 166" is comprised of, RGIS explains in its brief in opposition to conditional certification that RGIS is "sub-divided into nine Division Offices in the United States," below which there are "some 325 District Offices." *Johnson* Docket No. 41 at 2. The named Plaintiff in *Johnson* worked in RGIS's District 166, one of 22 District Offices in Texas. *Id*.

### 3. The Opt-In Consents

On January 26, 2007, approximately three weeks after this action was filed, all of the plaintiffs named in the complaint filed forms in which they consented to "opt in" to the collective action under 29 U.S.C. § 216(b). Docket No. 6. Since that time, Plaintiffs have continued to file consent forms by individuals seeking to join the collective action who are not named in the complaint. All of these consent forms are in substantially the same format, except that the most recently obtained forms contain a statement not included in the earlier forms consenting to magistrate jurisdiction. *See* Sabnis Decl., Exs. F, G & H. In each form, the opt-in plaintiff is required to provide his or her name, position with RGIS, and signature. *Id*.

### B. The Motion

RGIS asserts in the Motion that because the Court has not conditionally certified a class or approved notice to be sent to potential plaintiffs, Plaintiffs should not be soliciting consents from opt-in plaintiffs. Further, it asserts, the opt-in consent forms Plaintiffs have filed are deceptive and misleading because: 1) some of the job positions that opt-in plaintiffs have listed on their forms are not among the positions that make up the purported class; 2) the forms "presume" a three-year statute of limitations, but the statute of limitations is only two years if the violation was not wilful; and 3) some of the forms do not include consent to magistrate jurisdiction. Therefore, RGIS argues, the opt-ins should be declared invalid.

In their Opposition, Plaintiffs assert that they are entitled to file opt-in consents prior to conditional certification and that failure to do so would severely prejudice potential plaintiffs due to the running of the statute of limitations. Plaintiffs further assert that the opt-in consent forms are valid and that they have not abused the collective action process or acted unethically. In particular, they assert that they have sent out no improper notice and have engaged in no improper solicitation. They point out that potential plaintiffs may have learned about the action through word of mouth or from counsel's advertising website, rgisovertime.com ("the Website"), which includes an option allowing an interested individual to request information about the FLSA actions from Plaintiffs'

counsel. *See* Declaration of Camilla Roberson in Opposition to Defendant's Motion for an Order Declaring "Opt-Ins" Invalid ("Roberson Decl."), Ex. A (website pages).[3]

In its Reply, RGIS again asserts that Plaintiffs' opt-in consents are invalid and presents, for the first time, a declaration by an RGIS employee, Geoffrey Domowicz, who states that on April 6, 2007, he received an unwelcome telephone solicitation call from Plaintiffs' attorneys. *See* Declaration of Geoffrey Domowicz in Support of Defendant RGIS' Motion for An Order Declaring "Opt-Ins" Invalid ("Domowicz Decl."). According to Mr. Domowicz, he received a telephone call at home from a caller who said he was on a "fact-finding mission" relating to a lawsuit that had been filed involving RGIS. *Id*., ¶ 2. Mr. Domowicz states that he assumed the caller had been given his telephone number, which was unlisted, by RGIS, and that he revealed confidential information about his past wages because of this belief. *Id*., ¶ 3. He further states that the caller did not introduce himself as being from the firm of Schneider & Wallace until after Mr. Domowicz had answered the caller's questions. *Id*., ¶ 4. At that point, Mr. Domowicz told the caller that he was not interested in participating in the lawsuit. *Id.* Mr. Domowicz states that he would not have answered the caller's questions if he had realized "he was really calling [him] to try to get [him] to join a lawsuit against [RGIS]." *Id*., ¶ 5.

In a Surreply, Plaintiffs' attorneys assert that they were not engaging in telephone solicitation when they called Mr. Domowicz, but rather were responding to an inquiry by Mr. Domowicz that was made via the Website. Plaintiffs present a copy of an intake record showing that an e-mail inquiry from Mr. Domowicz was received by Schneider & Wallace on March 22, 2007. Declaration of Camilla Roberson in Support of Plaintiffs' Surreply in Opposition to Defendant's Motion for an Order Declaring "Opt-Ins" Invalid ("Roberson Surreply Decl."), Ex. A. According to Plaintiffs, the intake procedure for potential plaintiffs in the RGIS litigation is as follows:

> After Schneider & Wallace receives an Internet inquiry from a potential RGIS Plaintiff, that individual is contacted using the information provided in the e-mail. . . . The attorneys working on the RGIS case prepared a script and list of intake questions to be asked of all potential new clients. According to the script, the first thing the

---

[3] The Roberson Declaration does not state the date on which the web pages were printed. The Roberson Declaration is dated April 6, 2007.

5

> interviewer will do when they speak to an individual is introduce him or herself by name, job title, and company (Schneider & Wallace). Each interviewer also states that [he] or she is calling regarding the individual's inquiry about the lawsuit against RGIS. The interviewer also confirms that he or she works with the plaintiffs in the case. . . . The interviewer then asks the intake questions drafted by the attorneys. After asking the questions, the interviewer provides a summary of the allegations in the lawsuit, including the claim that auditors are not being paid properly for all time worked. After outlining the lawsuit, the interviewer will ask if that individual is interested in joining into the lawsuit and if the potential new client has any other questions or concerns. . . . During this interview process, the interviewer does not tell a potential new client that he or she is not being properly paid. Rather, the interviewer asks questions about whether the individual is compensated for all the time at work and how each interviewee is compensated. . . . If that potential client says that he or she wishes to join the lawsuit, Plaintiffs' counsel sends a packet to the potential client with a cover letter, a copy of a standard retainer form, a copy of the opt-in form, a copy of the operative Complaint for review, and a return envelope. Each potential client may call back to the office with more questions, may return the signed forms or may choose not to participate after reviewing the forms.

Roberson Surreply Decl., ¶¶ 5-11.

In a response to the Surreply, RGIS submits an additional declaration by Mr. Domowicz stating that he did not, in fact, submit his name on the Website and explaining that various abbreviations in the contact information are unlike those that he normally uses. *See* Declaration of Geoffrey Domowicz in Support of Defendant RGIS' Response to Sur-Reply Related to Motion for an Order Declaring "Opt-Ins" Invalid ("Domowicz Supp. Decl."). Mr. Domowicz states that he has heard rumors that RGIS employees have been providing the contact information of other employees on the Website. *Id*.

Finally, in response to RGIS's response, Plaintiffs' counsel have provided a declaration by the individual who called Mr. Domowicz stating that he clearly identified himself, that he followed the script described above, and that he believed that he was responding to a request for information from Mr. Domowicz. Declaration of Nathan Koff in Opposition to Defendant's Motion for an Order Declaring "Opt-Ins" Invalid ("Koff Decl.").

6

## III. ANALYSIS

### A. Legal Standard

#### 1. The Two-Tiered Approach to Class Certification

Under § 16 of the FLSA, workers may sue their employers for unpaid wages on their own behalf and on behalf of "other employees similarly situated." 29 U.S.C. § 216(b). Any employee who wishes to participate in such a collective action is required to give consent in writing and file that consent in the court in which the action is brought. *Id*. District courts in the Ninth Circuit have generally applied an "ad hoc two- tiered approach" in determining whether the plaintiffs are similarly situated. *Gerlach v. Wells Fargo & Co.*, 2006 WL 824652 (N.D. Cal. March 28, 2006) at * 2 (citing *Wynn v. Nat'l Broad. Co., Inc.*, 234 F. Supp. 2d 1067, 1082 (C.D. Cal. 2002) (noting that majority of courts prefer this approach)). Under this approach, the district court makes two determinations. *Id*. First, the court determines whether a collective action should be certified for the purpose of sending notice to potential class members ("the notice stage"). *Id*. At this stage, the standard is lenient, requiring "little more than substantial allegations, supported by declarations or discovery, that 'the putative class members were together victims of a single decision, policy, or plan.'" *Id*. (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001)). Second, after discovery has concluded, the court revisits the question of whether the class meets the "similarly situated" requirement, this time applying a stricter standard. *Id*. This second determination involves a review of several factors, including "the disparate factual and employment settings of the individual plaintiffs; the various defenses available to the defendant which appear to be individual to each plaintiff; fairness and procedural considerations; and whether the plaintiffs made any required filings before instituting suit." *Id*. If the court finds that the standard is not met, the class will be decertified. *Id*.

The two tiered-approach described above was developed in the wake of the Supreme Court's decision in *Hoffman-La Roche, Inc. v Sperling*, 493 U.S. 165 (1989). In *Hoffman-La Roche*, the plaintiffs brought a putative collective action under the Age Discrimination in Employment Act ("ADEA"), which incorporates provisions of the FLSA, including the opt-in procedures in 29 U.S.C. § 216(b). *Sperling v. Hoffman-La Roche, Inc.*, 118 F.R.D. 392, 399 (D.N.J. 1988). The action was

1 brought by a group of employees who had been fired by their employer on February 4, 1985 as part
2 of a systematic reduction in force, or "RIF" that resulted in the firing or demotion of approximately
3 1,200 employees. *Id*. at 395. Within a month of the RIF, a group of putative class members was
4 formed, calling itself R.A.D.A.R. (Roche Age Discriminatees Asking Redress). *Id*. at 408. On
5 March 7, 1985, R.A.D.A.R. sent a letter to an unspecified number of terminated Roche employees
6 soliciting consent to join a collective action and seeking financial contributions for the litigation. *Id*.
7 The letter was signed by six putative class members and was accompanied by a consent form that
8 contained six paragraphs of text and left blank spaces for the employee's name, address, birth date,
9 age, salary, salary grade, and signature. *Id*. On May 7, 1985, the plaintiffs filed an action asserting,
10 *inter alia*, a claim under the ADEA. *Id*. at 397.

11 During discovery, the plaintiffs in *Hoffman-La Roche* brought a motion seeking discovery
12 from the employer of the names and addresses of all employees who had been fired or demoted in
13 the RIF in order for the court to send out an official notice of the pendency of the action, along with
14 opt-in forms, to whichever potential class members had not yet filed written consents with the court.
15 *Id*. at 396. The defendant opposed the motion on the basis that the court did not have the authority
16 to facilitate notice on behalf of the plaintiffs under § 16(b) of the FLSA or the ADEA. The
17 defendant further sought to invalidate the opt-in forms that had already been filed – some 400 forms
18 – on the basis that the March 7 letter sent by R.A.D.A.R. to potential plaintiffs was defective on a
19 variety of levels. *Id*. at 408. The district court noted, however, the defendant did not "seriously
20 argue[] that plaintiffs themselves can or should be prohibited from communication with absent class
21 members." *Id*. at 404.

22 With respect to the first question, the district court concluded that "it is permissible for a
23 court to facilitate notice of an ADEA suit to absent class members in appropriate cases, so long as
24 the court avoids communicating to absent class members any encouragement to join the suit or any
25 approval of the suit on the merits." *Id*. at 402. The court based its conclusion on the remedial
26 purpose of the ADEA as well as the general policy of judicial economy. *Id*. at 403. The district
27 court further found that judicial involvement was appropriate in that case because the plaintiffs
28 believed that there were up to 600 potential plaintiffs, 200 of whom had not been discovered. *Id*.

8

The district court also found that court-authorized notice was appropriate because the plaintiffs had made a sufficient showing, even if not conclusive, that the plaintiffs were "similarly situated." *Id*. at 406. The court noted that by allowing notice before a conclusive finding had been made would avoid a "chicken-and-egg limbo in which the class could only notify all its members to gather together after it had gathered together all its members . . . ." *Id*. Thus, the court ordered the defendant to turn over the names and addresses of the potential class members and the court approved an official notice to be sent to those individuals. *Id*. at 404.

The district court went on to reject the defendant's assertion that the already-filed opt-in consents should be invalidated. The court began by noting that it had found no case law that addresses the meaning of consent in the context of a § 216(b) opt-in procedure. *Id*. at 408. Accordingly, the court borrowed from case law addressing the circumstances under which a law firm's client has "effectively consented to representation by the law firm despite a conflict of interest on the law firm's part." *Id*. In this context, consent has been described as "'full and effective disclosure of all the relevant facts . . . sufficient to enable [the consenting party] to make an informed decision.'" *Id*. (quoting *IBM v. Levin*, 579 F.2d 271, 282 (3d Cir. 1978). Applying this standard, the district court concluded that "the March 7 letter and consent form are not flawed in any way which vitiates the consents they solicited." *Id*. at 410. On this basis, the defendant's motion to invalidate the consent forms was denied. *Id*.

On appeal, the Supreme Court affirmed the district court's holding regarding court-facilitated notice, holding that "district courts have discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) . . . by facilitating notice to potential plaintiffs." 493 U.S. at 169. In support of this conclusion, the Court pointed to the "substantial interest [of the trial court] in communications mailed for single actions involving multiple parties." *Id*. at 171. In particular, it noted, court-authorized communications may be used to counter the "potential for misuse of the class device, as by misleading communications." *Id*. The Court further held that "it lies within the discretion of the district court to begin its involvement early, at the point of initial notice, rather than at some later time. . . . This procedure may avoid the need to cancel consents obtained in an improper manner." *Id*. at 171-72. The Court did not address the question of whether the opt-in consents were invalid

9

1 because the Court of Appeals had declined to reach that issue on the basis that defendants had taken
2 an immediate appeal from the district court's ruling and the ruling regarding the validity of the opt-
3 in consents was not appealable as a collateral order. *See Sperling v. Hoffman-La Roche, Inc.*, 862
4 F.2d 439, 441 (3d Cir. 1988).

### 2. The Filing of Opt-In Consents: Timing and Format

Under the FLSA, a collective action for unpaid wages may be brought within two years after the alleged violation occurs unless the violation is willful, in which case the statute of limitations is three years. 29 U.S.C. § 255. An action is considered to be commenced, for statute of limitation purposes, either 1) when the complaint is filed, if the plaintiff is named in the complaint and filed a written consent to become a party at the time the complaint was filed; or 2) on the date a consent to become a party was filed, if the plaintiff was either unnamed in the complaint or failed to file a consent at the time the complaint was filed. 29 U.S.C. § 256(a). Aside from this provision, the FLSA does not specify when opt-in consents may or may not be filed. Although the Court has found no case that directly addresses the issue, courts generally allow opt-ins to be filed at any time in the action and even look to these opt-in consents – or the lack thereof – as evidence on the question of whether a class in an FLSA collective action should be conditionally certified. *See, e.g., Stanfield v. First NLC Fin. Servs., LLC*, 2006 WL 3190527 (N.D. Cal. Nov. 1, 2006) (noting that at time motion for conditional certification was filed, 164 current and former employees had filed opt-in consents in FLSA action); *Pfohl v. Farmers Ins. Group*, 2004 U.S. Dist. LEXIS 6447 (C.D. Cal. 2004) at *30 (denying certification of class in part on the basis that plaintiffs had solicited class members on a nationwide website and had "failed to come up with allegedly similarly situated employees,"); *Realite v. Ark Rests. Corp.*, 7 F. Supp. 2d 303, 307 (S.D.N.Y 1998) (conditionally approving class in FLSA collective action based, in part, on the fact that the plaintiffs had submitted 10 affidavits indicating a violation had occurred); *cf. Lombardi v. Altemose Constr. Co. Inc.*, 69 F.R.D. 410, 411 (E.D. Pa. 1975) (dismissing collective action under FLSA on basis that no consents had been filed seven months after action was initiated).

There is little case law addressing what constitutes a valid opt-in consent. It is established that to be valid, an opt-in consent must at least be signed by the individual who seeks to participate.

10

*See Kulik v. Superior Court*, 203 F. Supp. 938, 941 (D.C. Ill. 1962) (holding that a typewritten document containing an individual's name but no signature was *not* a valid consent under 29 U.S.C. § 216(b)). A case decided by the Fifth Circuit, *Montalvo v. Tower Life Building*, suggests that beyond the signature requirement, the requirements for a valid consent are not particularly rigorous. 426 F.2d 1135, 1147-48 (5th Cir. 1970). There, the plaintiffs were maids and janitors who sought unpaid wages from their employer. *Id*. at 1137. The plaintiffs signed a document that requested only that "legal action be taken to secure my claim for me due me under the Fair Labor Standards Act." *Id*. at 1148. A xerox copy of this document was filed with the complaint. *Id*. Subsequently, the plaintiffs produced the original document. *Id*. The court held that this original document "demonstrated clearly that the plaintiffs, by signing their names, had in fact given their consent to becoming plaintiffs in a suit for recovery under the [FLSA]." *Id*. The court found further support for its conclusion based on the fact that "the only testimony adduced on this point indicated that the plaintiffs, though unschooled in legal technicalities, had a basic understanding of the nature of the consent they were giving by their signatures." *Id*. The standard in *Montalvo* is consistent with the standard adopted by the district court in *Hoffman-La Roche* with the respect to the validity of opt-in consents, discussed above.

### 3. Legal Standards Governing Communications with Potential Class Members

In general, pre-certification communications with potential collective action members are permitted unless there is a "clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil v. Bernard*, 452 U.S. 89, 100 (1981) (holding that district court abused its discretion limiting communications between parties and potential class members because it did not adequately consider the difficulties the limitations posed for potential plaintiffs seeking to vindicate their legal rights)). With this standard in mind, court may limit communications where a party has engaged in misleading or improper communications. *See Parks v. Eastwood Ins. Servs.*, 235 F. Supp. 2d 1082, 1084 (C.D. Cal. 2002). Communications may also be limited on the basis that they are inconsistent with court-authorized notice. *Id*.

11

### B. The Opt-In Consents in this Case

RGIS asks the Court to invalidate the opt-in consents that have already been filed on two grounds. First, RGIS implies, if it does not argue outright, that under the two-tiered approach discussed above, it is improper to file opt-in consents before the court has conditionally certified a class. Second, RGIS asserts that even if it is permissible to file opt-in consents prior to conditional certification, the consents that have been filed in this case are invalid because the communications on which they are based are improper and/or misleading. The Court rejects both arguments.

First, as discussed above, courts generally allow opt-in consents to be filed at any time. Indeed, the statute envisions that at least the named plaintiffs will file their opt-in consents at the outset of the case, along with the complaint. *See* 29 U.S.C. 256(a). RGIS seems to envision a procedure whereby only named plaintiffs would be permitted to file opt-in consents prior to conditional certification while all other individuals desiring to participate in the collective action would have to wait until the court conditionally certified the class, even as the statute of limitations was running on the claims of these potential plaintiffs. There is no authority that supports such a procedure.

Second, the Court rejects RGIS's assertion that the opt-in consents that have already been filed are invalid. In reaching this conclusion, the court applies the standard adopted by the district court in *Sperling v. Hoffman-La Roche, Inc.*, namely, whether there has been "full and effective disclosure of all the relevant facts . . . sufficient to enable [the consenting party] to make an informed decision." 118 F.R.D. at 408 (citation omitted). The Court concludes that this standard does not impose hyper-technical requirements but rather, is met so long as the plaintiffs have a "basic understanding" of what they are consenting to. *See Montalvo v. Tower Life Bldg.*, 426 F.2d at 1147-48. Applying this standard, and having carefully reviewed the consent form that has been completed by the opt-in plaintiffs, the Court concludes that nothing in this form is so inaccurate or misleading as to vitiate the consent of the opt-in plaintiffs.

RGIS's arguments regarding the alleged deficiencies of the consent form are without merit: the reference to the three-year statute of limitations in the form is consistent with Plaintiffs' allegation that RGIS has acted wilfully; an understanding that this case is being handled by a

12

magistrate judge rather than a district court judge is not required to have a basic understanding of the case for the purposes of consent; and the fact that some of the individuals have listed job titles that may or may not fit into the class that is ultimately certified is one that is more appropriately addressed at a later stage of the case.

Having concluded that the opt-in consents that have been filed are not invalid, the Court also addresses RGIS's assertion that Plaintiffs' counsel have acted improperly because their website is misleading and/or because they have engaged in "cold-calling." With respect to the Website, the only representation that appears to be misleading is the statement that the class in *Johnson* "is closed to further participation as part of the normal progress of that case." Roberson Decl., Ex. A. This statement, while previously accurate, became inaccurate on March 26, 2007, when the *Johnson* class was decertified. While the Website clearly needs to be updated, it is not so misleading as to affect the Court's conclusion as to the opt-in consents (to the extent the new plaintiffs relied on the Website) or to justify the imposition of other limitations on communications.

The dispute regarding the telephone call to Mr. Domowicz is somewhat more troubling. Although it has no relevance to the validity of the opt-in consents (as Mr. Domowicz did not consent to participate in the action), it suggest that Plaintiffs' counsel may need to approach telephone communications with potential plaintiffs with increased caution. As a factual matter, the Court finds that the call to Mr. Domowicz was made based on the good faith belief that Mr. Domowicz had expressed interest in participating in the lawsuit and on that basis, the Court concludes that Plaintiff's counsel did not act improperly. Nonetheless, Plaintiffs' counsel are now on notice that names of potential plaintiffs obtained through the Website may not have been provided by the individuals themselves but rather, by some other employee. Therefore, Plaintiffs' counsel shall, henceforth, confirm at the *outset* of any conversation initiated in response to an inquiry via the Website, that the individual who is being called did, in fact, submit his or her personal information via the Website in order to receive additional information regarding these actions. Plaintiffs' counsel shall also include a warning on their Website indicating that it is not permissible for an individual to provide contact information for anyone but himself or herself.

**IV. CONCLUSION**

For the reasons stated above, the Motion is DENIED.

IT IS SO ORDERED.

Dated: June 11, 2007

JOSEPH C. SPERO
United States Magistrate Judge